# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| DAYCAB COMPANY, INC., | ) | |
| | ) | Case No. 3:20-cv-63 |
| *Plaintiff,* | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| WILLIAM OSMAN, WANDA OSMAN, | ) | |
| BIG TRUCK PARTS LLC, and PRAIRIE | ) | |
| TECHNOLOGY, LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |

---

## MEMORANDUM OPINION

---

Before the Court are DayCab Company, Inc.'s ("DayCab") motions for partial summary judgment (Doc. 184), to exclude the testimony of Greg Wandling (Doc. 197), to file excess pages (Docs. 205, 215), and to supplement its expert disclosures (Doc. 211). Also before the Court are Defendants William Osman, Wanda Osman, Prairie Technology LLC ("Prairie"), and Big Truck Parts LLC's ("BTP") (collectively, "Defendants") motions for partial summary judgment[1] (Doc. 199) and to exclude the testimony of Marc Wagers (Doc. 201). For the reasons herein, DayCab's motions for partial summary judgment and to supplement its expert disclosures are **DENIED**. Its motion to file excess pages is **GRANTED**, and its reply will be deemed filed. DayCab's motion to exclude the testimony of Greg Wandling is **GRANTED IN PART**. Defendants' motion to strike the testimony of Marc Wagers is **GRANTED IN PART**, and its motion for partial summary judgment is **GRANTED**.

---

[1] The parties style their motions as motions for partial summary judgment, but the Court's decisions on the cross-motions resolve the entirety of the case.

# I.     BACKGROUND

## A.     DayCab and its XL Conversion Kits

DayCab designs, manufactures, and sells conversion kits for tractor-trailer cabs that convert a sleeper tractor—which has a compartment designed for long-haul driving, with a sleeping unit for the driver—into a tractor that does not have a sleeper unit (a "daycab"). (Doc. 188, at 1.) Marc Wagers, the founder of DayCab, started his first conversion-kit business in his garage in 1997 and has been continuously involved in the design and manufacture of various conversion kits since that time. (*Id*. at 2, 6.) Wagers states that he was the first person to create extended-cab conversion kits, which he called his "Fat Albert" models. (*Id*. at 4.)

At issue in this case are DayCab's "XL" conversion kits for two types of Peterbilt rigs: the Unibilt and Ultracab. (*Id*. at 5.) DayCab introduced these models in or around 2004. (*Id*.) DayCab spent significant time and money marketing its products, nearly $534,726 from 2001 to 2018. (*Id*. at 30.) In 2004, DayCab sold 25 kits; in 2020, it sold 772. (*Id*.)

Wagers avers that his goals in designing the XL models were to: (1) "allow more room in the cab for the driver and/or for storage of more equipment than the flat-panel unit provided"; (2) "allow for the installation or use of an air-ride system or similar equipment, in some cases"[2]; and (3) "be distinctive in appearance so it would be recognizable by consumers." (Doc. 188, at 6.) The Unibilt model (left) and Ultracab model (right) are pictured below.

---

[2] Both parties generally agree that consumers replace the air-ride system, rendering obsolete the space to attach the shock absorbers. (Doc. 188, at 8–9.)



(Doc. 188, at 7.)  Wagers identified the XL models' trade dress as follows:  (1) a slant-back design with specific angles and radii, including a 144-degree slant towards the cab and rolled edges with radii of 1.5 inches; (2) a conversion-kit depth of 5.375 inches; (3) rounded edges with specific angles and radii; and (4) grey colors.  (*Id*. at 5, 9.)  DayCab states that the kit depth of 5.375 inches "allows additional room inside the cab" and the slant-back design "allows space for the attachment of air-ride equipment."  (Doc. 199-2, at 77–78.)

### B.    Big Truck Parts and Prairie Technology's Competing Kits

BTP and Prairie are both owned by Bill Osman and located in Sioux Falls, South Dakota.  (Doc. 189, at 7.)  Osman began making conversion kits in 1998.  (*Id.* at 56.)  He performed his first Peterbilt conversion in 1999, and in 2000, the U.S. Patent Office awarded Osman Patent Number 6,076,884 for a "Truck Cab Conversion Panel."  (*Id.* at 42.)  The '884 Patent summarizes the invention as "[a] one-piece fiberglass panel [that] is provided for the retrofit conversion of a sleeper truck cab into a day cab."  (*Id*. at 46.)  In 2015, Osman started Prairie and BTP.  (*Id*. at 53–54.)

Prairie manufactures conversion kits, and BTP sells the manufactured kits.  (*Id*.)  These kits sell for $1,325 to $2,060.  (*Id.* at 54.)  Each kit is manufactured and sold with an

identification card with Prairie's logo embedded in the fiberglass and is shipped in a box bearing Prairie's logo. (*Id.* at 55, 60–61.) Additionally, BTP places a placard on the driver's side door of reconfigured cabs bearing its name and logo. (*Id.* at 64.) BTP and Prairie named their conversion-kit products "Cousin Albert," Uncle Albert," and "Fat Boy." (Doc. 188, at 20–23; Doc. 189, at 2–10.)

At some point, Prairie posted a promotional video on its website that featured Ray Shirle, a Canadian body-shop owner, wearing a shirt with the Ray's Sandblasting and Custom Trucks ("Ray's") logo on it. (Doc. 199-2, at 50.) Ray's logo bears substantial similarity to DayCab's logo, which is registered through the United States Patent and Trademark Office. (Doc. 172, at 13.) Shirle averred that the logo was obtained from the public domain in Canada, and that he has ceased using the logo. (Doc. 199-2, at 50.) Furthermore, he stated that Ray's has no affiliation with Defendants beyond being a certified installer for Prairie products. (*Id.*)

### C. Fibertech and Installation Confusion

Arvil Lewis runs a company that competes with DayCab and Prairie named FiberTech. (Doc. 189, at 19–20.) Lewis testified that there are very few players in the daycab-conversion market—just DayCab, FiberTech, Prairie, and Peterbilt. (*Id.* at 20–21.) He further testified that he cannot distinguish between DayCab and Prairie's models when the converted rigs are on the road. (*Id.* at 27.)

James Stegall—a Missouri truck-shop owner—also testified regarding the similarities between DayCab and BTP's kits. (Doc. 189, at 70.) According to Stegall, a customer brought in a rig to be converted from a sleeper into a daycab, and Stegall completed the installation with a kit the customer provided. (*Id.* at 71.) After the installation was completed, the rig needed an interior, so the customer ordered a DayCab interior, as both Stegall and the consumer believed

4

Case 3:20-cv-00063-TRM-DCP   Document 228   Filed 06/23/22   Page 4 of 23   PageID #: 3436

the conversion kit to have been manufactured by DayCab. (*Id*. at 72.) However, when the interior arrived, it did not fit because the kit was actually manufactured by Prairie, rather than DayCab. (*Id*. at 74–75.)

### D. The Instant Suit

DayCab instituted the present action on January 8, 2020, asserting claims under the Lanham Act and Tennessee Consumer Protection Act for trade-dress infringement. (*Id*.) Defendants brought a counterclaim for a declaratory judgment that DayCab's trade dress is functional and that they have not infringed on DayCab's trade dress or trademark. (Doc. 175.) On April 11, 2022, both Defendants and DayCab filed cross-motions for summary judgment (Docs. 184, 199). On the same day, DayCab filed a *Daubert* motion as to Defendants' expert Greg Wandling (Doc. 197), and, shortly after, Defendants filed a motion to strike the testimony of Marc Wagers (Doc. 201). These motions are now ready for the Court's review.

## II. MOTIONS TO EXCLUDE EVIDENCE

### A. Standard of Law

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Sixth Circuit has identified three requirements for an expert's testimony to be admissible under Rule 702: (1) "the witness must be qualified by knowledge, skill, experience,

training, or education"; (2) "the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue"; and (3) "the testimony must be reliable." *Burgett v. Troy-Bilt, LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008)) (internal quotation marks omitted). With respect to the first requirement, courts consider whether the qualifications "provide a foundation for a witness to answer a specific question," as opposed to considering his or her qualifications in the abstract. *Id.* (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The party offering the expert testimony must prove the expert's qualifications by a preponderance of the evidence. *Id.* (citing *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008)).

Reliability, the third requirement, is assessed by the factors set out in Rule 702 itself— whether the testimony is based on sufficient facts or data, whether the testimony is the product of reliable principles and methods, and whether the principles and methods used were reliably applied. *In re Scrap Metal*, 527 F.3d at 529 (citing Fed. R. Evid. 702). The focus is on reliability rather than "credibility and accuracy." *Superior Prod. P'ship v. Gordon Auto Body Parts Co., Ltd.*, 784 F.3d 311, 323 (6th Cir. 2015) (quoting *In re Scrap Metal*, 527 F.3d at 529). Thus, courts should focus on the methodology employed rather than the conclusions drawn. *Id.*; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). In determining whether expert testimony "is the product of reliable principles and methods," Fed. R. Evid. 702(c), courts may consider whether the methods and principles have been and are capable of being tested, whether they have been subjected to peer review and publication, their known or potential rate of error, and whether they are generally accepted within the relevant scientific community. *See Daubert*, 509 U.S. at 593–94; *see also United States v. Mallory*, 902 F.3d 584, 592–93 (6th Cir.

2018) (noting that all of the factors do not necessarily apply in every case). The inquiry, however, is flexible, and the district court may also consider other factors that bear on the reliability of the expert's testimony. *See Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999) ("[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.").

"[R]ejection of expert testimony is the exception rather than the rule," and "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Burgett*, 579 F.3d at 376 (citations omitted) ("*Daubert* did not work a seachange over federal evidence law, and the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system."). A district court may, but need not, hold an evidentiary hearing to aid in the decision of whether to grant a *Daubert* motion. *See Kuhmo*, 526 U.S. at 152 ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." (emphasis in original)); *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001).

### B.     Analysis

#### i.     *DayCab's Motion to Exclude Wandling's Testimony*

DayCab has moved to exclude the expert testimony of Dr. George Wandling (Doc. 197) on the bases that (1) he is not qualified, and (2) his testimony would not help the jury decide any fact in issue. (Doc. 198, at 3.) Wandling is a certified mechanical engineer who received his doctorate in mechanical engineering from Iowa State University in 2000 and has more than forty years of engineering experience. (Doc. 199-2, at 29.) In his report, Wandling states that he

based his opinions on records, data, and materials provided to him, an inspection of Prairie and DayCab conversion kits for Unibilt and Ultracab rigs, and an interview with Osman. (*Id.* at 9.) After reviewing these materials and conducting a laser analysis of the kits, Wandling opined that the measurements of the conversion kits at issue were:

1. Prairie Technology Ultracab: 5.52 inches deep; angles of 143.0 to 143.9 degrees; radii of 0.38 and 1.31 inches.

2. DayCab Ultracab: 5.55 inches deep; angles of 143 degrees; radii of 0.20 and 1.50 inches.

3. Prairie Technology Unibilt: 5.39 inches deep; angles of 144 degrees; radii of 5.03 and 0.06 inches.

(*Id.* at 20–21.) DayCab did not provide Wandling a Unibilt model to laser measure. (*Id.*) Wandling's report goes on to state:

> The Prairie Technology and Daycab Ultracab conversion panels are not identical. The Prairie Technology Ultracab panel can be physically placed inside the Daycab panel. The depth of the panel is a function of the Peterbilt seat location and the seat's extension beyond the rear of the cab structure. If the Peterbilt seat did not extend beyond the conversion panel mounting surface, the panel would be flat. The use of a radius rather than a sharp corner at panel edges is functionally required for manufacturability of the panel, and the radii used by Prairie Technology and Daycab are distinctly different. The sloped bottom surface of the panel functionally provides clearance for the Peterbilt suspension hardware, facilitates removal of the panel from the mold, and has an[] acute angle of approximately 36 degrees. The gray color of the panel is a function of the gel coat used in the manufacture of the panel and each panel is ultimately painted to the specification of the purchaser.

(*Id.* at 22.) Wandling's report then provides the following opinions: (1) that the '884 Patent was issued before DayCab sold its first Peterbilt kit; (2) that "Daycab has not produced any evidence" that its kits were "designed and manufactured" prior to Prairie's; (3) that the DayCab and Prairie kits "are not identical"; (4) that Defendants "did not take a wax or plaster impression of DayCab's Ultracab conversion panel nor intentionally make an exact or near-exact replica of the [sic] DayCab's Ultracab panel using other means"; (5) the "panel's depth, top body radius, lower

body angle, flange/body radius" and color are functional; and (6) DayCab may have infringed on Osman's patent. (*Id.* at 26.)

Wandling's first two opinions regarding the timing of the competing products' introductions must be excluded because they are unhelpful to the jury. To the extent such dates are relevant at all, the jury will be able to analyze the evidence, including the date of the issuance of the '884 Patent, and determine whether Osman's patent predated DayCab's sales. Furthermore, whether DayCab has presented sufficient evidence that its products predated Osman's is a question best left to the jury, as they are tasked with weighing evidence. Additionally, Wandling has not applied any reliable methods or skills to arrive at his first two opinions; rather, they are observations that could be made (or not) by a lay observer. Accordingly, the Court will grant DayCab's motion as to Wandling's first two opinions.

Wandling's third opinion that Osman "did not take a wax or plaster or similar impression" of DayCab's products, "nor intentionally make an exact or near-exact replica of such products," is not based on any specialized knowledge or skill, and Wandling is not qualified to opine on Osman's intention in creating the product. Wandling does not provide any factual support for his assertion that a plaster or wax mold was not taken. As a result, the Court will grant DayCab's motion as to Wandling's statements about Osman's intentions and whether he used a wax or plaster mold to create the Prairie Ultracab conversion kit.

While DayCab seeks to exclude Wandling's third and fifth opinions regarding the similarity and functionality of the two conversion kits as unsupported, Wandling is clearly qualified to testify on such matters. He has years of engineering experience, examined the products closely, and states why the trade dress is functional in his report. Such opinions meet

the requirements of Rule 702, and the Court will not exclude Wandling's opinion regarding the similarity and functionality of the two kits.

Lastly, the Court will exclude Wandling's final opinion regarding potential patent infringement. This is not a patent case, and presentation of such evidence will not help the jury determine any fact in issue—indeed, such presentation would likely lead to needless jury confusion and delay. Fed. R. Evid. 403. Consequently, DayCab's *Daubert* motion is **GRANTED IN PART**.

### ii. *DayCab's Motion to Supplement Expert Disclosures*

DayCab seeks permission to supplement its expert disclosures to add Wagers as an expert witness even though the deadline for disclosing experts has passed. (Doc. 211.) Federal Rule of Civil Procedure 37(c)(1) provides, in relevant part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The Sixth Circuit considers five factors when evaluating whether a party's nondisclosure is substantially justified or harmless:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015).

In this case, DayCab knew about Wagers and his testimony from the inception of this case. He has been identified as a witness consistently throughout this proceeding, yet DayCab chose not to disclose him, or any other individual, as an expert. And while Defendants knew that Wagers would testify, they were not aware that he would offer opinion testimony until the filing

of the parties' cross-motions for summary judgment.  While the trial date is still weeks away,

there is unlikely to be enough time for Defendants to secure a rebuttal expert.  Consequently, the

Court finds that DayCab's failure was not substantially justified or harmless, and it may not

supplement its expert disclosures at this late stage in the proceeding.  Accordingly, its motion to

supplement its expert disclosures will be **DENIED**.

### iii.    *Defendants' Motion to Strike Marc Wagers' Testimony*

Defendants have also moved to strike portions of Wagers' declaration, arguing that he

was not disclosed as an expert witness and that his opinions are not lay opinions under Federal

Rule of Evidence 701.  (Doc. 201.)  "The function of lay opinion testimony is to describ[e]

something that the jurors could not otherwise experience for themselves by drawing upon the

witness's sensory and experiential observations that were made as a first-hand witness to a

particular event."  *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015); *see also* Fed. R.

Evid. 701.  Furthermore, "lay testimony results from a process of reasoning familiar in everyday

life, whereas an expert's testimony results from a process of reasoning which can be mastered

only by specialists in the field."  *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 240 (6th Cir.

2010) (internal citation omitted).  Generally, the penalty for failure to disclose an expert witness

is a prohibition on using the expert testimony at trial.  Fed. R. Civ. P. 37.

Defendants move to strike various portions of Marc Wagers's declaration as undisclosed

and improper expert testimony.  Defendants first object to Wagers's statement that DayCab's

Peterbilt XL kits "are distinctive and have been recognized in the marketplace since the time of

their introduction."  (Doc. 188, at 5.)  While this statement could constitute lay opinion

testimony—Wagers is discussing an inference based on facts he perceived as a person involved

in trucking—in this case, it gives the Court pause because distinctiveness is a relevant and

important legal question in dispute. *See United States v. Lay*, 612 F.3d 440, 448 (6th Cir. 2010) ("A lay witness may testify to a legal conclusion that "does not involve terms with a separate, distinct and specialized meaning in the law different from that present in the vernacular."). Because distinctiveness has a particular meaning in the trade-dress context, Wagers's statement is an impermissible legal conclusion. A jury could review the evidence and determine whether DayCab's products are distinctive in the marketplace for itself. Consequently, the Court will grant Defendants' motion and strike Wagers's statement regarding the distinctiveness of DayCab's products.

Second, Defendants move to strike Wagers's statement that he has twenty-four years of experience in the conversion-kit business and that he does "not know of anyone who could match or exceed [his] experience in the business." (Doc. 188, at 3.) These, however, are statements of fact made from Wagers' personal knowledge. A jury could decide whether they find Wagers' credible regarding these statements.

Third, Defendants object to Wagers's statements regarding Defendants' intent. Wagers states:

> The idea that Mr. Osman could have independently come up with the nearly identical design of the Osman/Prairie Technology model on his own without intentionally copying the DayCab design is, in my opinion, beyond belief.
>
> . . .
>
> It is my opinion that the use of product design/trade dress and product name that had been used by DayCab was, and continues to be, an intentional effort to create product confusion between the Defendants' products and DayCab's products.

(*Id.* at 17, 23.) These statements are speculative and are not based on Wagers's particularized knowledge as an officer of DayCab. Wagers may not testify as to whether it is or is not hypothetically possible to independently engineer an identical product, nor may he testify as to

whether Defendants' actions were intentional, as he does not have facts upon which to base this inference. Fed. R. Civ. P. 701. Furthermore, intentionality is a legal issue in this case, and to allow Wagers to testify in such a manner may mislead the jury. After hearing the totality of the evidence, the jury can decide whether Defendants' actions were intentional. Accordingly, the Court will grant Defendants' motion as to Wagers's statements regarding intent.

Fourth, Defendants object to Wagers' statements regarding the similarity of the products and their attachment styles because it impermissibly expresses an opinion. Wagers states:

> The very slight difference in appearance resulting from the two different types of attachment is not apparent except to the most careful (close-up) observer, cannot be detected from a distance of approximately ten feet or more, and does not contribute to the product confusion.

(Doc. 188, at 24.) Wagers's testimony is not related to his personal knowledge. He may testify as to whether he, personally, notices a difference between the two products, but may not testify as to what a common observer would notice. As for his statement regarding product confusion, he may testify as to whether the slight difference does or does not contribute to his own confusion but may not generalize this to the common observer, as this would be impermissible expert testimony.

Next, Defendants move to strike Wagers's discussion of Mack conversion kits as irrelevant. In his declaration, Wagers states that, "as an interesting side note," Osman ordered one of DayCab's Mack kits in 2010. (*Id.* at 25.) According to Wagers, "DayCab had established itself as the overwhelming industry leader" in conversions "by the time Mr. Osman put his near-exact replicas" on the market, and "other than intentional copying, there would be no other way that Mr. Osman could have ended up with the same design." (*Id.* at 26–28.) Mack conversion kits are not at issue in this case—Peterbilt kits are. Consequently, Wagers's statements regarding the Mack kits are irrelevant.

Defendants seek to exclude Wagers's statement that, "to [his] knowledge, at the time, DayCab had the only Peterbilt extended cab conversion kits on the market," arguing that the statement is "simply untrue." (*Id.* at 27.) However, Wagers states that this fact is based on his personal knowledge and Defendants may impeach him using contradictory evidence to the extent such evidence exists. As a result, the Court will not exclude this statement.

Finally, Defendants attempt to exclude a variety of Wagers's statements on the grounds that they are inadmissible hearsay. First, Defendants move to exclude Wagers's statement that consumers called him because of the advertising and told him that they associate the slant-back design with DayCab. (*Id.* at 30.) While this statement likely constitutes hearsay under Rule 801, it is not clear that such evidence could not be presented in an admissible manner at trial—i.e., the consumers taking the stand and testifying to the same. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 423-24 (6th Cir. 2021). Consequently, the Court will not exclude this statement for the purposes of summary judgment.[3] Defendants similarly seek to exclude Wagers's statements that customers called him expressing confusion about Osman's products and the offering an email chain between Wagers's brother and a customer. (Doc. 188, at 31, 34–36.) The Court will not exclude these statements for present purposes, either, as they could be produced in admissible form at trial. In total, therefore, Defendants' motion is **GRANTED IN PART**.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Law

Summary judgment is proper when "the movant shows that there is no genuine dispute as

---

[3] The Court also notes that its determination regarding the admissibility of these statements does not impact the outcome in this case. *See infra* Section III. If, however, Wagers himself seeks to take the stand to introduce these statements, they would be a fruitful target for a hearsay objection.

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

The standard of review when parties file cross-motions for summary judgment is the same as when only one party moves for summary judgment. *Taft Broad. Co. v. United States*,

929 F.2d 240, 248 (6th Cir. 1991). When there are cross-motions for summary judgment, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id*. In considering cross motions for summary judgment, the court is "not require[d] . . . to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948).

### B. Analysis

#### i. *Claims Under the Lanham Act and the TCPA[4] for Trade-Dress Infringement*

Both parties have moved for summary judgment on DayCab's claim for trade-dress infringement and on Defendants' corresponding counterclaim for declaratory judgment. Trademark law "is designed to promote brand recognition, not to insulate product manufacturers from lawful competition." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l Inc.*, 730 F.3d 494, 500 (6th Cir. 2013). Trade-dress protection must coexist with the fact that "copying is not always discouraged or disfavored by the laws which preserve our competitive economy." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001); *see also Dastar Corp. v. 20th Cen. Fox Film Corp.*, 539 U.S. 23, 33–34 (2003) ("The Lanham Act . . . does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of patent law and its period of exclusivity.").

Trade dress, in short, "refers to the image and overall appearance of a product." *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1238–39 (6th Cir. 1991). "[T]o recover for trade dress infringement under § 43(a), a party must prove by a preponderance of the evidence: 1) that the

---

[4] "The same analysis that applies to the federal Lanham Act claims also applies to the state claims of unfair competition under Tennessee common law and of violations of the Tennessee Consumer Protection Act ("TCPA")." *Thomas & Betts Int'l LLC v. Burndy LLC*, No. 2:14–cv–02296–JPM–tmp, 2015 WL 5944387, at *3 (W.D. Tenn. Oct. 13, 2015) (McCalla, J.).

trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002). "The first two elements are the requirements for protectability, and the third element is the standard for evaluating infringement." *Id*.

Trade dress is not protectible if it is functional. *See TrafFix*, 532 U.S. at 29 (noting that "trade dress protection may not be claimed for product features that are functional."). "A product design is functional 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Groeneveld*, 730 F.3d at 503 (citing *Inwood Labs*, 456 U.S. at 850 n.10). For example, the Supreme Court "has held that the 'dual-spring design' employed at the base of road signs to make them withstand strong wind gusts is functional and therefore cannot be protected as trade dress." *Id*. at 503 (citing *TrafFix*, 532 U.S. 23).

In this case, DayCab's motion for summary judgment fails—and Defendants' succeeds— because the undisputed evidence demonstrates that DayCab's asserted trade dress for its conversion kits is functional. DayCab seeks to protect several components of its conversion kits: (1) the slant-back design with specific angles and radii, including a 144-degree slant towards the cab and rolled edges with radii of 1.5 inches; (2) a conversion-kit depth of 5.375 inches; (3) rounded edges with specific angles and radii; and (4) grey colors.

By its own admission, however, at least two of the product features that DayCab seeks to protect are functional. In its interrogatory responses, DayCab stated that the conversion-kit depth "allows additional room inside the cab" and the slant-back design "allows space for the attachment of air-ride equipment." (Doc. 199-2, at 78.) Added space in the cab and the ability to reuse an air-ride system inevitably affect the quality of the article, as consumers may choose

certain models for these features. Furthermore, in his report, Wandling—Osman's expert—opined:

> The depth of the panel is a function of the Peterbilt seat location and the seat's extension beyond the rear of the cab structure. If the Peterbilt seat did not extend beyond the conversion panel mounting surface, the panel would be flat. The use of a radius rather than a sharp corner at panel edges is functionally required for manufacturability of the panel, and the radii used by Prairie Technology and Daycab are distinctly different. The sloped bottom surface of the panel functionally provides clearance for the Peterbilt suspension hardware, facilitates removal of the panel from the mold, and has an[] acute angle of approximately 36 degrees. The gray color of the panel is a function of the gel coat used in the manufacture of the panel and each panel is ultimately painted to the specification of the purchaser.
> . . .
>
> The trade dress asserted by DayCab of the UltraCab and Unibilt panel's depth, top body radius, lower body angle, flange/body radius, and the color of Prairie Technology's panel prior to painting are functional aspects of the panel design and manufacturing process.

(*Id.* at 22.) DayCab has not offered any admissible evidence rebutting Wandling's testimony, and, as a result, there is no genuine dispute of material fact regarding the functionality of DayCab's trade dress. Additionally, DayCab's assertion that the Prairie kit could have been differently designed is of no importance to the Court's decision: once a product feature is deemed functional, the Court need not "engage . . . in speculation about other design possibilities." *TrafFix*, 532 U.S. at 33. Accordingly, no reasonable jury could find that DayCab's trade dress is nonfunctional. Therefore, its motion for summary judgment must be **DENIED** on this basis.[5] Defendants' declaratory-judgment counterclaim is a mirror image of DayCab's trade-dress claim, and, based on the foregoing analysis, must be **GRANTED**.

---

[5] Because DayCab has not demonstrated that it is entitled to summary judgment on the elements of protectability, the Court need not reach the infringement analysis. *See Abercrombie*, 280 F.3d at 629; *see also Groeneveld*, 730 F.3d at 504.

### ii. *Claims Against the Osmans in Their Personal Capacities*

The Osmans argue that there is no basis in this case to pierce the corporate veil to hold either individual personally liable for the LLCs' potential liability. However, the Court need not reach this argument. To the extent that DayCab seeks to assert its Lanham Act and TCPA claims against the Osmans individually, the Osmans are entitled to summary judgment on these claims in the same measure as Prairie and BTP, as DayCab's trade dress is not protectible. *See supra* Section III.B.ii.a,.

### iii. *Claims Under the Lanham Act for Trademark Infringement*

Defendants also move for summary judgment on DayCab's trademark-infringement claim, to the extent it asserts one. (Doc. 199-1, at 21–24.) Because the complaint is not a model of clarity, it is difficult to discern whether DayCab asserts such a claim at all. In its second amended complaint, DayCab states, "[t]his civil action is brought for infringement of unregistered trade dress under § 43(a) of the Lanham Act . . . and for violations of the Tennessee Consumer Protection Act" and requests "injunctive relief and damages for the Defendants' manufacturing and/or marketing products that are exact or near-exact replicas of products manufactured and marketed by" DayCab.[6] (Doc. 172, at 2.) While the second amended complaints mentions DayCab's logo at various points—including by attaching DayCab's trademark registration for the logo—nowhere does it explicitly assert a claim for trademark infringement under the Lanham Act. *(Id.* at 13.) Instead, it appears that DayCab uses the logo allegations to support its assertion of confusing similarity between the two products. For

---

[6] At the end of the second amended complaint, DayCab repeats this assertion with a slight change that includes the logo, requesting "Injunctive relief ordering the Defendants to cease and desist from further using the Plaintiff's unregistered trademarks (and logo) pursuant to the Lanham Act and/or the Tennessee Consumer Protection Act." (Doc. 172, at 25.)

example, DayCab states: "The use of this logo is itself an infringement of the Plaintiff's trademark rights and is also making a substantial contribution to the confusion brought about by the Defendants' other wrongful actions." *(Id.* at 15.) If DayCab did assert a trademark-infringement claim, it would presumably be on the basis that Prairie misappropriated DayCab's registered trademark through the promotional video featuring Ray Shirle on its website. Nonetheless, it does not appear that DayCab is asserting a standalone trademark-infringement claim, and, thus, summary judgment would be inappropriate.

Even if DayCab asserted a trademark-infringement claim, Defendants would be entitled to summary judgment. The Lanham Act establishes liability for an individual who, without the permission of the trademark owner:

(a) [U]se[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) "reproduce[s], counterfeit[s], cop[ies], or colorably imitate[s] a registered mark and appl[ies] such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

*Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 443 (6th Cir. 2021) (quoting 15 U.S.C. § 1114(1)) (alterations in original). The touchstone of the analysis is whether the use of the mark is likely to cause customer confusion. *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 623 (6th Cir. 1996); *see also Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275 (6th Cir. 1997); *Bird v. Parsons*, 289 F.3d 865, 877 (6th Cir. 2002)

("Generally speaking, the key question in cases where a plaintiff alleges trademark infringement . . . is whether the defendant's actions create a likelihood of confusion.").

In *Ohio State University v. Redbubble*, the Sixth Circuit reiterated that Lanham Act liability is not limited to "those who actually create, manufacture, or packing the infringing items." 989 F.3d at 446. The Sixth Circuit has said that "even minimal advertisements constitute use of the owner's trademark in connection with the advertising of the goods, which the Lanham Act proscribes." *Audi AG v. D'Amato*, 469 F.3d 534, 546 (6th Cir. 2006). However, certain interactions with infringing products are deemed to be outside the Lanham Act's grasp. *See Bird v. Parsons*, 239 F.3d 865, 876–78 (6th Cir. 2002) (holding that a company that auctions infringing domain names does not "use" the infringing names in the meaning of the Lanham Act); *see Redbubble*, 989 F.3d at 446 (noting that "[i]t's true that online marketplaces, like eBay and Amazon, that facilitate sales for independent vendors generally escape Lanham Act liability" (citing *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 103, 109 (2d Cir. 2010)). Thus, Lanham Act "use" can fairly be viewed as a spectrum, with those who manufacture or sell infringing products bearing more culpability than those who passively facilitate infringement, like Amazon.

Prairie's "use" of the similitude of DayCab's logo falls on the lower end of the spectrum. In this case, neither Prairie nor BTP is a manufacturer or seller of any good that bears DayCab's registered logo. *See Redbubble*, 989 F.3d at 446 ("Neither party disputes that an entity that is either (i) the creator or manufacturer of the offending goods, or (ii) a direct seller of the offending goods (e.g., a brick-and-mortar store or company website) is liable under the Lanham Act."). The only basis for a trademark-infringement claim is a promotional video on the Prairie

website that allegedly features Ray Shirle wearing a shirt bearing the Ray's logo, which indisputably resembles the DayCab logo. (Doc. 199-2, at 50.)

No reasonable jury could conclude that this qualifies as use in the meaning of the Lanham Act.[7] While the video is promotional in nature—it is on the Prairie website to advertise its products—it does not *use* the Ray's logo to accomplish such promotion. Rather, it is what the video portrays that is the commercial goal of the video. This outcome is consistent with the purpose of the Lanham Act, as well, which is to prevent the unauthorized *commercial* use of another's trademark for an individual or company's financial benefit. *See Dastar Corp. v. 20th Century Fox Film Corp.*, 539 U.S. 23, 28–29 (2003). Shirle could have worn a plain white t-shirt in the video and it would have the same commercial impact, at least from Defendants' perspective, as the one alleged to be infringing. Accordingly, Defendants' motion for summary judgment is **GRANTED** as to any potential trademark-infringement claim.

## IV.    CONCLUSION

For the foregoing reasons, DayCab's motions for partial summary judgment (Doc. 184) and to supplement expert disclosures (Doc. 211) are **DENIED**. DayCab's motion to exclude the

---

[7] Even if the Court determined that the promotional video qualified as "use," no reasonable jury could find a likelihood of confusion. *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007). The Sixth Circuit uses an eight-factor test in ascertaining whether there is a likelihood of confusion: (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Id.*

While the marks are visually similar, DayCab has not presented any evidence of actual confusion or that Prairie intended to confuse or deceive customers through the fleeting appearance of Shirle in one of its promotional videos. Shirle and Ray's are not affiliated with Prairie beyond being a certified installation partner. (Doc. 199-2, at 55–56.) Furthermore, the video is embedded on the Prairie website, which is clearly identified with the Prairie logo in multiple locations on the webpage. (Doc. 188, at 20, 47.) And, finally, conversion kits are a niche product and consumers are likely to exercise substantial care in purchasing. (Doc. 189, at 38–39; Doc. 199-2, at 54.)

testimony of Greg Wandling (Doc. 197) is **GRANTED IN PART**, and its motions to file excess

pages (Docs. 205, 215) are **GRANTED**. Defendants' motion for partial summary judgment

(Doc. 199) is **GRANTED**, and their motion to exclude the testimony of Marc Wagers (Doc. 201)

is **GRANTED IN PART**.

   **AN APPROPRIATE JUDGMENT SHALL ENTER.**

            **/s/ _Travis R. McDonough_**
            **TRAVIS R. MCDONOUGH**
            **UNITED STATES DISTRICT JUDGE**